UNITED STATES FIDELITY & GUARANTY CO. et al. v. PEOPLES BANK & TRUST CO. OF WESTFIELD.

No. 5732.

Circuit Court of Appeals, Third Circuit.

Sept. 27, 1935.

Rehearing Denied Nov. 7, 1935.

McDermott, Enright & Carpenter and Carl S. Kuebler, all of Jersey City, N. J., for appellants.

Nichols & Snevily and Leonard Belford, all of New York City, for appellee.

Before BUFFINGTON, DAVIS, and THOMPSON, Circuit Judges.

DAVIS, Circuit Judge.

This case requires the construction of a bankers' blanket bond, so-called, which indemnified the Peoples Bank & Trust Company, the plaintiff, against loss resulting from larceny and other causes. The case was tried to the District Court and a jury. After the plaintiff had put in its evidence, the defendants, the United States Fidelity & Guaranty Company and the National Surety Company and its receiver, made a motion to nonsuit the plaintiff. The motion was denied. The defendants then made a motion for a directed verdict against the plaintiff. This motion was likewise denied and the District Court submitted the case to the jury on the plaintiff's evidence. The jury found its verdict in favor of the plaintiff and, after denying a rule to show cause why the verdict should not be set aside, the court entered judgment thereon in favor of the plaintiff. The defendants appealed.

The clause of the bond in question provides that:

"(B) Any loss of Property through robbery, larceny, burglary, theft, holdup, misplacement, or destruction, whether effected with or without violence or with or without negligence on the part of any of the Employees, while the Property is within any of the Insured's offices covered hereunder, or within any recognized places of safe deposit within the United States of America or Dominion of Canada, or within the premises of any of the Insured's bankers or correspondent banks, or lodged or deposited by the Insured in the ordinary course of business for exchange, conversion or registration of the issuers thereof or with any agents of such issuers, or with any persons employed to procure or manage the exchange, conversion or registration thereof."

The bond was in effect during the year 1932.

On January 9, 1932, McDougall, an employee of the plaintiff, gave to Arthur Atkins, who conducted an investment business in New York City, an order to purchase 40 shares of the stock of the American Telephone & Telegraph Company at $100. This order was reduced on March 31 to 35 shares.

The plaintiff's sole office was located in Westfield, N. J., and Atkins, who lived in Westfield, frequently stopped on his way to New York City at the office of the plaintiff to negotiate whatever business he might have with it.

On April 20, Atkins stopped at the office of the plaintiff and notified it that he had executed its order for 35 shares of American Telephone stock as directed, presented a bill, and asked for instructions for registering the stock. The plaintiff gave him the necessary information and delivered its check to him for $3,509.75 in payment for the stock.

On May 3, the plaintiff gave Atkins an order for 25 shares of American Telephone stock at 96½. On May 6, Atkins came to the office of the plaintiff and, presenting a confirmation of the purchase of the stock, notified it that the order for 25 shares had been executed and asked for instructions. The plaintiff thereupon delivered its check to him for $2,417.50 in payment of the stock. Atkins had received the check for each order from the plaintiff on the day following the purchases and forthwith deposited the checks in the bank account for his investment business.

Atkins did not have a membership in the New York Stock Exchange and it was his practice to make purchases of stock sold on the Exchange through a member firm. Prior to 1932, he had had both cash and margin accounts with such a firm with which he regularly dealt. He had closed out his cash account and in 1932 executed all of his orders through his margin account.

The orders for 35 shares and 25 shares of the stock of the American Telephone Company which the plaintiff had placed with Atkins were purchased through his margin account on April 19 and May 5, respectively. The entries in Atkins' books tend to show that the stocks were purchased for the plaintiff and that payment was received for them from the plaintiff.

Atkins withdrew from the checking account $3,000 on April 20, and $3,050 on May 6. He paid those amounts to his broker to "pick up" or pay for certain stocks which Atkins had bought on his margin account for customers other than the plaintiff. Since the payment of the

checks, Atkins has not had sufficient funds in his bank account to fulfill his obligations, which amount to the sum of $5,926.-25, to the plaintiff.

He has never delivered the stock to the plaintiff for either of the orders. Shortly after the bank paid him for the stock, it inquired on several occasions about the stock and Atkins stated that some difficulties concerning the transfer of the stock were delaying its delivery to the bank.

The question here is whether or not the conduct of Atkins, while he was in the business office of the plaintiff, in relation to the two checks which he received from it, constitutes larceny.

While this is a close case, its facts appear to be outside the usual scope of indemnity bonds of the type involved here. The bond protected the plaintiff against any loss of property through "larceny (whether common-law or statutory)."

Larceny implies theft and not fraud. At common law, larceny was defined as the felonious taking of the property of another with the intent to convert it to the use of the taker. 2 Leach 1089; 4 Bla. Com. 229; 2 Wharton on Criminal Law (11th Ed.) § 1094ff, page 1311. The common-law scope of larceny has been greatly broadened by statute and the several states have written varying degrees of changes into their laws. In New Jersey, where Atkins received the checks, the Crimes Act no longer uses the word "larceny," but has substituted for it a principal topic, "Stealings and Other Takings," under which such crimes are set out. There is also a group listed under the topic "Frauds and Embezzlements." 2 N. J. Comp. St. 1910, p. 1792 et seq., § 158 et seq., and supplements.

At any rate, the statutory enlargements of the common-law crime have not brought frauds and embezzlements within the accepted meaning of larceny or its equivalent in New Jersey. Larceny signifies theft; embezzlement and false pretense signify frauds.

In Bassett v. Spofford, 45 N. Y. 387, 6 Am. Rep. 101, the court said: "Fraudulent and wrongful taking being proved with the felonious intent, the animo furandi, the only question remaining in any case is whether the taking was with the consent of the owner; for if so, although the consent was obtained by gross fraud, there is no larceny. * * * If the owner intends to part with the property and delivers the possession, there can be no larceny, although fraudulent means have been used to induce him to part with the goods."

Thus, to constitute larceny, there must be a taking against the consent of the owner; and the taking will not be larceny if consent be given, though obtained by fraud. Lewer v. Commonwealth, 15 Serg. & R. (Pa.) 93; 2 Bishop on Criminal Law (9th Ed.) § 808; 36 C. J. 777, § 139; 2 Wharton on Criminal Law (11th Ed.) § 1152, p. 1374.

It would be a corruption of the accepted understanding of the word "larceny" to bring a wrongdoer within its definition to whom title and possession to property have passed at the time of acquiring it. But it was said in State v. Deutsch, 77 N. J. Law, 292, 299, 72 A. 5, 8, that: "A man may be found guilty of larceny who obtains property fraudulently, even though the intent of the parties is to pass the title; for, upon ordinary principles of law, the fraud prevents the title from passing."

That language seems too broad. This case furnishes an example of the erroneous language in that dictum. The general statement that "fraud prevents the title from passing" is incorrect. There is no doubt that the plaintiff intended that the title to the two checks should pass to Atkins and that the title did pass to him, whatever his intention may have been.

As above stated, the evidence is that according to a custom of long standing, Atkins stopped in the office of the plaintiff on April 20 and May 6 and said that he had purchased the order of stock on the day before those respective dates, presented his bill, and requested a check to pick up the stock and have it registered in the name of the plaintiff's customers. He had in fact already purchased the stocks through his margin account, but after each of those occasions, he used the proceeds of the checks given him by the plaintiff for his own purposes.

It does not appear that Atkins received the checks in any fiduciary or agency capacity. The defendant vested him with title to the money in payment of an ordinary indebtedness. Whatever intention Atkins may have had to convert the proceeds of the checks, that fraudulent intention did not prevent him from receiving an unqualified title to the checks. The felonious intent must coincide with an un-

lawful taking to be larceny. In this case, Atkins became the owner of the checks when they were delivered to him on the plaintiff's business property.

The judgment of the District Court is reversed.